IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Harrisonburg Division

| | | |
|---|---|---|
| CAROLYN ANNETTE DINGES, | ) | Civil Action No. 5:14-cv-00032 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **REPORT & RECOMMENDATION** |
| | ) | |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | By:  Joel C. Hoppe |
| Defendant. | ) | United States Magistrate Judge |

Plaintiff Carolyn Annette Dinges seeks review of the Commissioner of Social Security's
("Commissioner") final decision denying her application for disability insurance benefits
("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401–34. On appeal, Dinges
argues that the Administrative Law Judge ("ALJ") erred in assessing her residual functional
capacity ("RFC"). This Court has jurisdiction pursuant to 42 U.S.C. § 405(g), and this case is
before the undersigned magistrate judge by referral under 28 U.S.C. § 636(b)(1)(B). After
considering the administrative record, the parties' briefs and oral arguments, and the applicable
law, I find that the ALJ's decision is supported by substantial evidence, and I recommend that
the Commissioner's decision be affirmed.

I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final
determination that a person is not entitled to disability benefits. *See* 42 U.S.C. § 405(g); *Hines v.
Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is limited—it may not
"reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment" for
that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). Instead, the Court
asks only whether the ALJ applied the correct legal standards and whether substantial evidence
supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011).

1

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review takes into account the entire record, and not just the evidence cited by the ALJ. *See Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984); *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951). Ultimately, this Court must affirm the ALJ's factual findings if "'conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled.'" *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam) (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (internal quotation marks omitted)). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" if he or she is unable engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505(a). Social Security ALJs follow a five-step process to determine whether an applicant is disabled. The ALJ asks, in sequence, whether the applicant: (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant work based on his or her residual functional capacity; and, if not (5) whether he or she can perform other work. *See* 20 C.F.R. § 404.1520(a)(4); *Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983). The applicant bears the burden of proof at steps one through four.

*Hancock*, 667 F.3d at 472. At step five, the burden shifts to the agency to prove that the applicant is not disabled. *See id.*

## II. Procedural History

Dinges was born on December 22, 1964, Administrative Record ("R.") 180, and at the time of the ALJ's decision was considered a "younger person" under 20 C.F.R. § 404.1563(c). She graduated high school and attended some college, R. 51, and she has prior work history as a stockroom supervisor and offset press operator, R. 68, 204. She also operated a daycare. R. 51

Dinges applied for DIB on June 16, 2011. R. 180–81. She alleged a disability onset date of February 5, 2009,[1] based on fibromyalgia, methicillin-resistant staphylococcus aureus ("MRSA"), disc problems, neck and shoulder pain, numbness in hands and arms, swelling pain, knee pain, swollen feet, and lower back pain. R. 203.

The Commissioner rejected Dinges's applications initially and on reconsideration. R. 22. On February 27, 2013, the ALJ held an administrative hearing at which Dinges was represented by counsel. *See generally* R. 46–72. In a written opinion dated April 25, 2013, the ALJ found that Dinges had degenerative disc disease, fibromyalgia, lupus, connective tissue disease, and shoulder problems, which qualified as severe impairments. R. 24. The ALJ determined that none of Dinges's severe impairments met or equaled the severity of a listed impairment, 20 C.F.R. Pt 404, Subpart P, Appendix 1. R. 25. As to Dinges's RFC, the ALJ determined that she could perform a reduced range of light work, 20 C.F.R. § 404.1567(b). *Id.* Relying on the testimony of a vocational expert, the ALJ determined that Dinges was unable to perform her past work, but

---

[1] Dinges previously filed for disability alleging an onset date of January 1, 2008, and her applications were denied on February 4, 2009. R. 73–82, 83–92. She did not appeal those determinations. R. 22. Subsequently, she filed the application at issue in this appeal and again alleged an onset date of January 1, 2008. The ALJ construed her subsequent application as alleging an onset date of the day after the denial of her previous applications, R. 22, and, at the administrative hearing, Dinges confirmed the date of her onset as February 5, 2009, R. 51.

3

she could perform other jobs in the national economy. R. 36–37. Accordingly, the ALJ determined that Dinges was not disabled under the Act. R. 37. The Appeals Council denied Dinges's request for review, R. 1–4, and this appeal followed.

### III. Discussion

On appeal, Dinges argues that the ALJ erred in assessing her RFC. She takes issue with the ALJ's determination that she can perform light work and his decision to reject the opinions of a treating physician and nurse that found she was capable of performing less than sedentary work. Pl. Br. 7–9, ECF No. 16.

*A.       Medical Evidence*

In June 2007, Dinges injured her right shoulder while repeatedly lifting heavy objects.[2] R. 376, 640. Although X-rays were negative, an MRI showed that she had a partial tear of the deltoid and trapezius muscles and a hematoma. R. 376. She was provided pain medications and directed to follow-up with her primary care physician, R. David Lee, M.D. *See* R. 377, 640. A couple of weeks later, she developed MRSA in her shoulder. R. 636. She was treated multiple times at Page Memorial Hospital and the University of Virginia Hospital for MRSA, R. 368–71, 378–83, 428–30, 563–72, and by October 2007, testing revealed that the infection had completely resolved. R. 632. Dinges engaged in physical therapy for her right shoulder and myalgias from August to December 2007. R. 384–406, 632. The therapists generally noted reduction in pain and improvement in joint mobility and muscle strength, but also persistent stiffness and some limitations in reaching. *Id.*

---

[2] Dinges also reported that books fell on her shoulder. R. 374, 428.

4

An MRI of Dinges's right shoulder taken on November 15, 2007, revealed a shallow bursal surface partial tear without full thickness rotator cuff tear, degenerative changes, and mild subacromial/subdeltoid bursitis. R. 478.

On December 19, 2007, David M. Kahler, M.D., examined Dinges related to her complaints of right shoulder pain. R. 559. He found that she had some loss of rotation and symptoms of impingement. *Id.* Dinges reported that she was unable to perform her full daycare duties. *Id.* During follow-up examinations over the next few months, Dr. Kahler found that Dinges had regained about 80% of rotation in her shoulder, had good strength, and was much better overall, but still experienced some shoulder and neck pain. R. 556–57. He provided injections to treat her pain. *Id.* Noting that Dinges was "greatly improved," Dr. Kahler opined that he would not need to see her for routine treatment. R. 556.

Treatment notes from July 2007 and March 2008 reported that Dinges had a history or diagnosis of fibromyalgia, R. 428, 579, but in December 2007 Dinges denied having any trigger points, and Dr. Lee found none on exam. R. 627.

On March 18, 2008, Glenn E. Deputy, M.D., performed nerve velocity testing on Dinges's upper extremities. R. 1501. The test results were "[a]bsolutely normal" with no evidence of neuropathy. *Id.* He noted that Dinges reported paresthesias and "shock-like" symptoms in both arms from the elbow down, but he opined that the cause of her symptoms was unclear and suggested to Dr. Lee that she undergo a cervical spine MRI. *Id.*

An MRI of Dinges's cervical spine taken on March 27, 2008, revealed a large disc osteophyte complex at C5-C6 that contacted the anterior margin of the spinal cord and mild to moderate degenerative changes at C6-C7, including a moderate bulge of the annulus without disc herniation. R. 577. No significant spinal stenosis was noted. *Id.*

5

On August 29, 2008, Dr. Lee noted that Dinges had decreased range of motion in her right shoulder, and Dinges complained of pain and decreased strength. R. 611. Dinges also reported having lower back pain. *Id.* A month later, Dinges told Dr. Lee that she had no improvement in symptoms. R. 609. She also reported that medication had stopped the tingling, burning sensation in her extremities at night, but it also made her fatigued. *Id.* On October 24, 2008, Dinges complained to Dr. Lee of neck pain, headaches, and blurred vision. R. 604.

The record contains treatment notes from Marie Jackson, N.P., from November 2010 to July 2011. R. 1021–43. Dinges complained of weakness in her right arm that prevented her from picking up heavy objects. R. 1041. She also complained of fatigue that she attributed to staying up late to attend her son's cross-country meets. R. 1042. She denied difficulty falling asleep or staying asleep. *Id.* Dinges said that she took care of school-aged children in her home. R. 1041. On examination, Nurse Jackson generally noted normal musculoskeletal findings, including a normal gait, but decreased range of motion in the right shoulder. R. 1039, 1042. She also noted tenderness in Dinges's right arm.

In January 2011, MRIs were taken of Dinges's cervical and lumbar spine. R. 794–95. They revealed left lateral disc herniation with marked impingement on the lateral recess and foramen at C5-C6, mild bulging of the annulus at C6-C7, mild facet and ligamentous hypertrophy at L3-L4 on the left, and mild foraminal narrowing at L4-L5 on the left. *Id.* Following this MRI, Robert C. Kime, III, M.D., examined Dinges for complaints of neck, back, and right shoulder pain and numbness in her hand and part of her left leg. R. 1116. He noted reduced range of motion in her right shoulder, slightly diminished grip strength, and pain inhibition weakness in her right arm. R. 1115. He found fairly good reflexes and no gross sensory deficits in any extremity. *Id.* Based on his review of Dinges's spine MRIs and his

6

physical examination, Dr. Kime opined that he did not have a clear neurologic picture, but her symptoms did not correlate well with the MRI findings. R. 1114–15.

On January 14, 2011, Daniel G. El-Bogdadi, M.D., examined Dinges for complaints of pain in her back, neck, and right arm and shoulder. R. 922. She also complained of fatigue, paresthesias, headache, numbness in her extremities, and weakness in her hands. *Id.* On examination, Dr. El-Bogdadi found tenderness over Dinges's spine, but no spasm. R. 925. He also found 12 tender points in assessing for fibromyalgia. *Id.* His findings were otherwise normal, including that Dinges had an intact gait. R. 924–25. Testing was positive for antinuclear antibody. R. 925. Dr. El-Bogdadi diagnosed joint pain, degenerative disc disease, and fibrositis. *Id.* He saw Dinges again on February 2, 2011, for complaints of lower back and right arm and shoulder pain. R. 918. Examination showed diffuse tender points, no motor weakness, and an intact gait. R. 918–19. Dr. El-Bogdadi diagnosed undifferentiated connective tissue disease and fibromyalgia and prescribed plaquenil, skelaxin, and ibuprofen. R. 919. Later that month and in April 2011, Dr. El-Bogdadi reported 10 fibromyalgia tender points, but an otherwise normal exam. R. 907–09, 912–14. On June 10, 2011, Dinges visited Dr. El-Bogdadi so that he could assess the efficacy of the TENS unit. R. 901. Dinges reported that it helped her pain and improved her ability to function. *Id.* On examination, Dr. El-Bogdadi noted 18 of 18 tender points, but otherwise normal findings. R. 902–03.

On January 25, 2011, Dr. Deputy conducted upper extremity electrical testing, which revealed normal findings, including no peripheral or acute cervical neuropathy. R. 828–29.

On February 22, 2011, Dr. Kime reviewed Dr. Deputy's test results and Dinges's January cervical and lumbar MRIs. R. 1108–09. He disagreed with the report of her lumbar MRI and determined that it showed no significant foraminal narrowing on either side. R. 1108. The only

7

findings on her lumbar MRI that he deemed significant were signs of mild facet arthropathy and some sclerotic change of the bone at L5-S1. *Id.* He again opined that this objective evidence did not correlate with Dinges's symptoms other than mild back pain. *Id.* He also noted only trivial disc desiccation at other levels of her lumbar spine. *Id.* Dr. Kime opined that because Dinges had no central canal stenosis, significant disc protrusions, or neurological compression, surgery was not likely to help with her neck or shoulder pain. R. 1108–09. Instead, he provided an injection to ease her pain. R. 1109. He noted other physicians' findings that she may have some degree of fibromyalgia.

The following month, Dinges visited a hospital emergency room complaining of severe pain throughout the right side of her body. R. 856. She reported that her symptoms had not resolved under the care of her doctors, and she asked for a second opinion. *Id.* Physical examination, testing, and laboratory studies were normal, and Dinges left the hospital before a doctor could discuss these findings or her condition. R. 856–57.

Dinges regularly participated in physical therapy from January to May 2011, R. 808–25, November to December 2011, R. 1261–67, and March to April 2012, R. 1595–1606. The records document the exercises Dinges performed and her reports of, at most, intermittent, partial improvement of her symptoms. Dinges indicated that physical therapy generally was not beneficial.

In April and June 2011, R. Samuel Arthur, M.D., evaluated Dinges on referral from Dr. El-Bogdadi and determined that she did not have lupus nephritis. R. 839–40, 853–55.

On August 2, 2011, Dr. Kime examined Dinges for complaints of right side pain. R. 1145. He found mild tendonitis in her right thumb and no crepitus in her right shoulder, although Dinges reported pain upon external rotation consistent with impingement syndrome. *Id.* Dr.

Kime ordered X-rays of her shoulder and upon their review noted an adequate distal clavicle excision, no significant anterior prominence of the acromion or residual bony impingement, no high riding of the humeral head, and normal glenohumeral articulation. *Id.* He determined that her shoulder was "not a candidate" for surgery and provided an injection, which he noted had provided her relief for two to three months in the past. *Id.* Dr. Kime had previously noted the possibility of arthroscopic surgery to remove scar tissue that may be contributing to her symptoms if the injections ceased providing relief, but he was concerned about infection given Dinges's history of MRSA. R. 1147. In December 2011, his assessment and treatment plan were unchanged. R. 1202.

On September 16, 2011, Dr. El-Bogdadi noted that Dinges had moderate to severe lupus, which caused musculoskeletal aches that were aggravated by activity. R. 1408. He found 18 fibromyalgia tender points and reported that she had a normal gait. R. 1410. He diagnosed undifferentiated connective tissue disease, which he noted was "quiet overall," and fibromyalgia. *Id.* He prescribed flexeril and plaquenil and recommended that Dinges continue physical and pool therapy. *Id.* In October 2011, Dinges reported pain on her entire right side, on which Dr. El-Bogdadi found diffuse tender points. R. 1415–17. In January 2012, he again found 18 out of 18 diffuse tender points, no motor or sensory deficits, and normal gait. R. 1439.

In October and November 2011, Dinges told Nurse Jackson that she experienced diarrhea when she consumed milk, ice cream, and calcium pills. R. 1224, 1227. Dinges continued to complain of right upper quadrant pain and was diagnosed with gallbladder disease. R. 1346. On December 20, 2011, her gall bladder was removed. R. 1298–99. Two weeks later, she still complained of right upper abdominal pain, but she denied diarrhea, swelling, or nausea. R. 1309.

On November 23, 2011, Dinges complained of joint, chest, and abdominal pain and requested a diagnosis for her hematuria. R. 1471. She agreed to have a kidney biopsy, although Dr. Arthur was skeptical that it would show any pathology. R. 1471–72. On January 13, 2012, Dinges had a renal biopsy, R. 1333, to check for lupus nephritis, R. 1336–37. The results showed no pathologic abnormalities. R. 1457.

Dr. Kime examined Dinges on February 22, 2012, for right shoulder impingement. R. 1615. He noted that she had no symptoms "whatsoever" in her left shoulder, but complained of pain in her right arm, flank, and leg. *Id.* He found that she had good range of motion in her shoulder, but with some pain upon external rotation, and no numbness and good grip strength in her hand. *Id.* He opined that her shoulder impingement did not have characteristics that warranted surgery, and he provided an injection for pain. R. 1614–15. Dr. Kime thought the pain in her arm, leg, and body was most likely attributable to fibromyalgia. R. 1615. On May 22, 2012, Dr. Kime noted that the effects of the injections seemed to be wearing off after only one month. R. 1613. He injected Dinges again and referred her to Kent Smillie, M.D., to determine whether surgery on her shoulder would be appropriate. R. 1612.

A week later, Dr. Smillie examined Dinges's right shoulder and found all normal results. R. 1609. None of his tests reproduced the pain Dinges had complained of in the past. *Id.* Her left upper extremity and bilateral lower extremities were normal as was her gait. *Id.* Radiographs from that day showed some change at her distal clavicle consistent with her prior surgery, but no significant degenerative changes, acute osseous process, or evidence of fracture, subluxation, or dislocation. *Id.* He could not find any evidence of a shoulder problem that contributed to her symptoms. R. 1608.

On April 22, 2012, Dinges complained to Harold F. Reilly, M.D., of experiencing diffuse pain throughout her abdomen and irregular, sometimes watery bowel movements. R. 1657–59. At Dr. Reilly's recommendation, Dinges underwent an esophagogastroduodenoscopy that revealed mild antral erythema, but was otherwise normal, and a colonoscopy that showed normal results. R. 1686–89, 1725. Dr. Reilly reviewed these test results and determined that Dinges had moderate to severe chronic gastritis. R. 1719. In June 2012, Dinges reported that she experienced loose stools only when she consumed dairy. *Id.* She still reported epigastric and abdominal pain, but felt better. *Id.* Dr. Reilly continued her on medications. R. 1719–20.

From November 2012 to January 2013, Dinges complained to Nurse Jackson of stomach pain. R. 1791–99. At times she complained of having diarrhea and experiencing increased body aching. R. 1794, 1797. She continued to complain of abdominal pain and diarrhea through April 2013. R. 1845, 1848.

On December 5, 2012, Dr. El-Bogdadi diagnosed Dinges with rheumatoid arthritis, although he noted no new or different findings on exam. R.1758–61. He also noted that her lupus was in remission. R. 1761.

On January 9, 2013, Mariecken Fowler, M.D., assessed Dinges for complaints of chronic pain and headaches as well as difficulty sleeping. R. 1767–69. Physical exam revealed 5/5 strength throughout and normal gait. R. 1768. Dr. Fowler recommended that the pain clinic manage Dinges's pain and that she wear a splint at night for left side carpal tunnel syndrome. R. 1768–69.

X-rays of Dinges's right shoulder taken on March 14, 2013, revealed mild degenerative changes of the acromioclavicular joint, but were otherwise unremarkable. R. 1837. An MRI taken a month later showed abnormal signal in the anterior/superior glenoid labrum that may

11

represent a tear and subchondral cystic change in the greater tuberosity, but no evidence of rotator cuff tear. R. 1839. Suzanne Stevens, M.D., reviewed these images and examined Dinges's right shoulder. R. 1900–01. She reported decreased range of motion with no crepitance and no locking or catching. R. 1900. Dr. Stevens recommended decompressive acromioplasty of the right shoulder. *Id.*

An examination in May 2013 performed by Rebecca D. Lehman, PA-C, also showed full strength in the upper and lower extremities, normal gait, and normal neck rotation and lateral bend. R. 1861–62.

A lumbar spine MRI taken on June 11, 2013, showed no significant stenosis that, according to the reviewing physician, would explain Dinges's radiculopathy symptoms and mild facet arthrosis at L5-S1. R. 1872. A cervical spine MRI from the same date showed a disc oseophytic protrusion resulting in mild spinal canal stenosis with slight compression of the C6 nerve root and moderate left neuroforaminal stenosis at C5-C6. R. 1875. At C6-C7, it revealed diffuse osteophytic bulge causing minimal spinal canal stenosis and mild right and moderate left neuroforaminal stenosis. *Id.*

B.    *Dinges's Statements*

In a functional report dated July 19, 2011, Dinges stated that she prepared simple meals for herself and two children, washed dishes, took care of pets, did laundry, cleaned the house, shopped for groceries once a week, drove a car, talked to friends on the phone and when they visited her house, went to doctor's appointments and the pharmacy, and attended her son's cross-country meets. R. 262–66. That same day, Dinges completed a work history report. She indicated that she had been self-employed running a day care from 2000 until the present. R. 277. In this role, she worked for 10 hours a day, five days a week feeding and bathing children, changing

their diapers, playing with them, and helping them with homework. R. 278. She lifted and carried

children, milk containers, and juice jugs, and frequently lifted up to 50 pounds. *Id.* During a

typical workday, she walked for one to two hours; stood for three to four hours; sat for two

hours; climbed for 15 minutes; and stooped, kneeled, crouched, grasped objects, reached, and

handled small objects as needed. *Id.*

On a work history form, Dinges wrote that she stopped working on January 1, 2011, but

made changes, which she did not specify, in the manner of her work as of February 5, 2009. R.

251–52. Dinges, however, told various treatment providers that she worked in daycare after

January 1, 2011. *See* R. 854 (April 2011), 1021 (July 2011), 1029 (March 2011), 1155 (January

2011, only one child).

At the administrative hearing in February 2013, Dinges testified that she stopped

operating a daycare around the time of her onset in February 2009. R. 51. She said she was

unable to work because she experienced fatigue and severe pain and aches in her joints, skin,

neck, back, and leg. *Id.* Ibuprofen relieved her pain, but it contributed to her stomach problems.

R. 52. She had trouble holding things, such as a gallon of milk, drinking cup, and tissue. R. 54;

*see also* R. 263.

C.      *Analysis*

Dinges challenges the ALJ's RFC determination. A claimant's RFC is the most she can

do on a regular and continuing basis despite her impairments. 20 C.F.R. § 404.1545(a); SSR 96-

8p, 1996 WL 374184, at *1 (July 2, 1996). It is a factual finding "made by the Commissioner

based on all the relevant evidence in the [claimant's] record," *Felton-Miller v. Astrue*, 459 F.

App'x 226, 230–31 (4th Cir. 2011) (per curiam), and it must reflect the combined limiting effects

of impairments that are supported by the medical evidence and the claimant's credible

13

complaints, *see Mascio v. Colvin*, 780 F.3d 632, 638–40 (4th Cir. 2015). An ALJ must assess a claimant's ability to perform all relevant functions and explain how he resolved any conflicting evidence as to those functions. *Id.* at 636–37.

The ALJ determined that Dinges had the RFC to perform light work consisting of occasionally lifting up to 20 pounds, frequently lifting up to 10 pounds, and walking or standing for six hours and sitting for six hours in an eight hour workday. R. 25. The ALJ assigned the following additional limitations: occasionally reach in front, laterally, and overhead with her dominant right arm; frequently reach with her left arm; never climb ladders, ropes, or scaffolds; and occasionally perform other postural activities, such as balancing and stooping. *Id.* Additionally, Dinges must avoid all exposure to workplace hazards, such as heights and moving machinery. *Id.*

In formulating this RFC, the ALJ gave some weight to the opinions of the state-agency physicians, but included additional limitations in reaching, climbing, and exposure to workplace hazards. R. 35. Otherwise, the ALJ's RFC determination mirrors the functional limitations assigned by the state-agency physicians. *Compare* R. 25 *with* R. 100–01 *and* R. 113–15.

In the section of his written opinion that addressed Dinges's RFC, the ALJ thoroughly discussed the medical evidence and Dinges's report of symptoms, activities of daily living, and work history. *See* R. 26–34. The ALJ's review of the evidence establishes that Dinges has a number of severe impairments and that she has been the subject of numerous imaging studies and medical examinations. Imaging of her spine and shoulder consistently revealed some changes, but Dinges's treating physicians also consistently opined that those findings did not correlate to the severity of her complaints of pain. Her medical providers recorded numerous physical examinations that consistently revealed normal gait and full strength in the upper and

14

lower extremities even though Dinges had limited range of motion in her right shoulder. The most significant departure from these relatively normal findings was Dr. El-Bogdadi's finding that Dinges had 18 positive trigger points relevant to her fibromyalgia. R. 33.

Dr. El-Bogdadi treated Dinges's fibromyalgia with medication and physical therapy—a course of treatment also recommended by her other medical providers for many of her other impairments. Some of these medications, flexeril and ibuprofen, relieved her pain. R. 1457, 1469, 1758. The ALJ considered this course of treatment and characterized it as conservative—a finding that may suggest that Dinges's symptoms were not as severe as she claimed. *See Viverette v. Astrue*, No. 5:07cv395-FL, 2008 WL 5087419, at *2 (E.D.N.C. Nov. 24, 2008). When assessing the nature of the treatment provided for fibromyalgia, however, the significance of the ALJ's characterization is limited because acceptable treatment for this condition typically is conservative. *Johnson v. Astrue*, 597 F.3d 409, 412–13 (1st Cir. 2009).

Furthermore, a diagnosis of fibromyalgia rests primarily on subjective complaints and clinical observation of symptoms, as objective testing has little bearing on the existence or severity of fibromyalgia. *See Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996). Thus, a lack of objective findings will not undermine a diagnosis of fibromyalgia. *Johnson*, 597 F.3d at 412–13. In most cases, however, fibromyalgia is not a disabling condition. *Sarchet*, 78 F.3d at 307. Because the absence of objective findings and the nature of the treatment provide little insight into the severity of a person's fibromyalgia, an ALJ should review other evidence in the record to assess a claimant's pain and other symptoms. *See Craig*, 76 F.3d at 595; 20 C.F.R. § 404.1529.

In weighing the medical evidence and Dinges's subjective complaints of pain, the ALJ reviewed her activities of daily living and her operation of a daycare. R. 34. He noted that Dinges

15

prepared meals for her family, washed dishes, performed some household chores, shopped for groceries and other items, socialized with friends, and attended her son's cross-country meets. R. 34. Additionally, she ran a daycare at her home until the fall of 2011—more than two and a half years after her alleged onset of disability. As Dinges related in a functional report, operating a daycare where she took care of children required considerable physical exertion, including standing, walking, and sitting for multiple hours each; lifting up to 50 pounds; and reaching, stooping, crouching, and handling objects as needed. *See* R. 277–78. Dinges reported some decrease in her daycare duties after February 2009, but she also testified that she stopped operating the daycare in February 2009. The ALJ found that her testimony about the cessation of her daycare activities was inconsistent and misleading. R.34. He reasonably chose to credit her functional reports and statements to treating medical providers over her contrary testimony of more restricted functional abilities. R. 34–35. The evidence of Dinges's daily activities and daycare operation provides ample support for the ALJ to question the credibility of her claims of severe physical limitation and disabling symptoms. *See Bishop v. Comm'r of Soc. Sec.*, 583 F. App'x 65, 68 (4th Cir. 2014) (stating that a reviewing court will defer to ALJ's credibility finding in all but "exceptional" cases). Furthermore, that evidence and the relatively normal medical findings provide considerable support for the ALJ's RFC determination.

In challenging the ALJ's RFC, Dinges argues that he erred in disregarding the opinions of her treating medical providers, Dr. El-Bogdadi and Nurse Jackson, who assigned much more restrictive physical limitations. Pl. Br. 7–9.

A treating-source medical opinion is entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence in the record." *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001);

16

20 C.F.R. § 404.1527(c)(2). If the ALJ finds that a treating-source medical opinion is not entitled to controlling weight, he then must weigh the opinion in light of factors including the source's specialty, the source's familiarity with the claimant, the weight of the evidence supporting the opinion, and the opinion's consistency with other evidence in the record. *Burch v. Apfel*, 9 F. App'x 255, 259 (4th Cir. 2001) (per curiam); 20 C.F.R. § 404.1527(c)(2). The ALJ must explain the weight given to all medical opinions, *Radford v. Colvin*, 734 F.3d 288, 295–96 (4th Cir. 2013), and he must give "good reasons" for the weight assigned to any treating-source medical opinion, 20 C.F.R. § 404.1527(c)(2). An ALJ may reject a treating-source medical opinion "in the face of persuasive contrary evidence[,]" but only if he gives "specific and legitimate reasons" for doing so. *Mastro*, 270 F.3d at 178. The ALJ may consider opinions from non-acceptable medical sources, such as nurse practitioners, as he would opinions from acceptable medical sources, but their opinions are not entitled to special deference under the regulations. *See Adkins v. Colvin*, No. 4:13cv24, 2014 WL 3734331, at *3 (W.D. Va. July 28, 2014); 20 C.F.R. § 404.1527.

In a written functional assessment dated October 17, 2011, Dr. El-Bogdadi opined that Dinges could sit and stand for no more than 15 minutes at a time; sit and stand or walk for less than two hours each in an eight-hour workday; lift less than 10 pounds and then only rarely; rarely twist, stoop, crouch, or squat; and never climb ladders or stairs. R. 1190–91. She could rarely look up or down, hold her head in a static position, or turn her head left or right. R. 1191. For five percent of an eight-hour workday, or 24 minutes, Dinges could grasp, turn, and twist objects with her hands; manipulate fine objects with her fingers; and reach overhead with her arms. *Id.* Dr. El-Bogdadi opined that she had equal limitations in her right and left arms, hands,

Case 5:14-cv-00032-MFU-JCH   Document 22   Filed 05/14/15   Page 17 of 21   Pageid#: 2033

and fingers. *Id.* He indicated that these restrictions applied as of November 14, 2010. *Id.* Nurse Jackson provided a similar assessment of Dinges's functional limitations. *See* R. 1193–96.

The ALJ gave no weight to the opinions of Dr. El-Bogdadi and Nurse Jackson. R. 35. He found their opinions inconsistent with the overall record, including Dinges's activities, and unsupported by their treatment and findings on examinations. His decision and analysis withstands scrutiny.

Dr. El-Bogdadi recorded no findings as to Dinges's left upper extremity, and the record during the relevant period is devoid of any medical findings supporting such extensive limitations. Indeed, Dr. Kime noted that Dinges had no symptoms "whatsoever" in her left shoulder. R. 1615. The record documents a finding of left sided carpal tunnel syndrome, but the only recommended treatment was wearing a splint at night, and no restrictions were noted. Thus, the record provides no support for the left arm, hand, and finger restrictions found by Dr. El-Bogdadi. Similarly, Dr. El-Bogdadi made no findings about Dinges's neck movements, and no treatment notes suggest that she could rarely move her head in any direction. The standing and walking restrictions also have little support. Physical exams routinely showed full strength in the lower extremities and normal gait.

Dr. El-Bogdadi's and Nurse Jackson's assessments of Dinges's limitations also conflict with her report of daily activities and daycare duties. Dinges's description of the lifting, sitting, standing, walking, stooping, crouching, handling, and reaching that she engaged in from 2000 until at least July 2011 were much more extensive than the severe limitations found by Dr. El-Bogdadi and Nurse Jackson.

Case 5:14-cv-00032-MFU-JCH   Document 22   Filed 05/14/15   Page 18 of 21   Pageid#: 2034

Considering the medical evidence in the record and Dinges's report of activities, the ALJ reasonably disregarded the opinions of Dr. El-Bogdadi and Nurse Jackson. Moreover, the record amply supports his RFC determination.

As a final matter, neither party addressed whether treatment notes from March to June 2013, *see supra* pp. 11–12, that Dinges submitted to the Appeals Council after the ALJ's decision constituted "new evidence."[3] The Appeals Council included some of this evidence in the record. R. 5–6, 1824–1915. While this evidence shows some change in Dinges's shoulder, for which Dr. Stevens recommended surgery, and her spine, a contemporaneous physical exam conducted one month before showed no deficit in strength, normal gait, and normal neck rotation and lateral bend. Moreover, no evidence in the record indicates that these changes caused deterioration in Dinges's functional capacity. The record before the ALJ consisted of over 1,500 pages of medical records, including multiple imaging studies and interpretations of those studies of Dinges's shoulder and spine, spanning the more than five years from her initial alleged disability onset date of January 1, 2008, to the date of the ALJ's opinion. The ALJ accounted for

---

[3] When a claimant appeals an ALJ's ruling, the Appeals Council first makes a procedural decision whether to grant or deny review. *Davis v. Barnhart*, 392 F. Supp. 2d 747, 750 (W.D. Va. 2005). In deciding whether to grant or deny review, the Appeals Council must consider any additional evidence that is new, material, and related to the period on or before the date of the ALJ's decision. *Wilkins v. Sec'y, Dep't of Health & Human Servs.*, 953 F.2d 93, 95 (4th Cir. 1991) (en banc) (citing 20 C.F.R. § 404.970(b)); *see also* SSR. 13-3p, 2013 WL 785484, at *1. "Evidence is 'new' if it is not duplicative or cumulative, and is material 'if there is a reasonable possibility that the new evidence would have changed the outcome.'" *Davis*, 392 F. Supp. 2d at 750 (quoting *Wilkins*, 953 F.2d at 95–96).

The Court may not attempt to weigh the new evidence or to resolve conflicts with existing evidence. *Dunn v. Colvin*, 973 F. Supp. 2d 630, 642 (W.D. Va. 2013) (citing *Smith v. Chater*, 99 F.3d 635, 638 (4th Cir. 1996)). Instead, it must determine whether the evidence was "material"—in other words, whether the evidence had "a reasonable possibility of changing the outcome of the case." *Id.* If the new evidence "is contradictory, presents material competing testimony, or calls into doubt any decision grounded in the prior medical reports," then it is conceivable that the ALJ would have reached a different result upon considering it, and the court must reverse. *Id.*

19

Dinges's shoulder impairment by limiting her to light work and reducing her ability to reach in all directions with her right arm. This post-decision medical evidence is thus not material, and it does not require remand. Should Dinges elect to file for disability again, she may want to submit it with her new application, as suggested by the Appeals Council.

IV. Conclusion

For the foregoing reasons, I respectfully recommend that the Commissioner's motion for summary judgment, ECF No. 18, be GRANTED, Dinges's motion for summary judgment, ECF No. 15, be DENIED, and the Commissioner's final decision be AFFIRMED.

**Notice to Parties**

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk is directed to transmit the record in this matter to the Honorable Michael F. Urbanski, United States District Judge.

The Clerk shall send certified copies of this Report and Recommendation to all counsel of record.

ENTER: May 14, 2015

Joel C. Hoppe
United States Magistrate Judge